UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.              ) | No. 1:20-CR-10192-IT |
| ) | |
| TEVON NGOMBA, a/k/a "Chow," ) | |
| ) | |
| Defendant.       ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
<u>MOTION TO SUPPRESS</u>**

The United States opposes defendant Tevon Ngomba's Motion to Suppress (the "Motion"). Dkt. 105. Law enforcement had probable cause to believe that the vehicle in which the defendant arrived as a passenger for a controlled gun deal, which he accessed (specifically, the trunk) during the deal, and to which he returned post-deal after cheating the cooperating witness of both the gun and money, contained evidence of criminal wrongdoing. Thus, no warrant nor consent was needed for law enforcement to conduct a post-deal search of the vehicle under the automobile exception doctrine. It therefore follows that law enforcement's seizure of both fentanyl from the car owner's glove compartment and a loaded gun from a bag (which law enforcement observed the defendant access during the deal) in the car owner's trunk was lawful.

Alternatively, having lawfully obtained consent to search the car owner's vehicle, law enforcement found a quantity of fentanyl in the passenger side glove compartment along with identification documents belonging to the defendant. The discovery of contraband (narcotics) in the car during a consent search provided probable cause for law enforcement to then search the car in its entirety, thus making the discovery of the loaded firearm in the trunk inevitable. Moreover, given that the defendant concedes that the car was not his own, *see* Dkt. No. 105-1, he has no standing to challenge the car search leading to the glove compartment fentanyl recovery

(which, in turn, made the gun's discovery inevitable). For these reasons and those set forth herein, the Court should deny defendant's motion to suppress and determine that the extreme remedy of suppression is not warranted. *Utah v. Strieff*, 579 U.S. 232, 237-38 (2016) (suppression is remedy of "last resort" that entails substantial societal costs).

## I. Factual Background[1]

In July and August 2020, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in collaboration with state and local law enforcement and the aid of a cooperating witness ("CW"), developed evidence that the defendant was selling narcotics and firearms in and around Somerville, Massachusetts. Specifically, in early July 2020 (weeks after the defendant's release from a multi-year period in state custody), the CW met the defendant at a party and received contact information from him for purposes of coordinating drug deals. *See* Ex. A at 1-2. The CW subsequently spoke to the defendant on two telephone numbers, 781-475-9237 and 857-247-5437. *Id*. at 2. In their communications, the defendant confirmed he had drugs for sale and discussed drug quantities and pricing. *Id.*

The defendant and CW coordinated a drug deal. Via phone communications, the defendant agreed to sell the CW fifty grams of a controlled substance (suspected to be heroin or fentanyl) in exchange for $1,800 on July 16, 2020. *See* Ex. A at 3. The morning of the July 16 deal, the CW and defendant communicated with one another and finalized the logistics of their meetup. The defendant instructed the CW to go to 31 Sydney Street in Somerville and park on

---

[1] The defendant largely adopts (and nearly sets forth verbatim) the facts from law enforcement reports as to the August 3, 2020 incident. *Compare* Doc. No. 105 at 1-3 *with* Ex. B at 1-3. For this reason, the government does not believe an evidentiary hearing is warranted. *United States v. Morales Torres*, 382 F. Supp. 3d 131, 136 (D. Mass. 2019) (quoting *United States v. Jimenez*, 419 F.3d 34, 42 (1st Cir. 2005)). Further, criminal defendants are not entitled to evidentiary hearings as a matter of course. *See United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990). Nevertheless, should there be an evidentiary hearing, the government expects to elicit testimony and introduce evidence consistent with the following facts. Any times cited herein are approximate.

the side of the street. *Id.* Before the deal, the CW met with various members of law enforcement and received $1,800 as well as a car to use during the anticipated drug deal with the defendant. Ex. A at 5. That car was equipped with hidden audio- and video-recording equipment (that functioned properly and captured the CW's meeting with the defendant). *Id*. The CW drove to the agreed-upon meeting location while investigators set up to surveil the scene.

Minutes after the CW arrived and parked in the area of 31 Sydney Street, a black Acura sedan ("the black Acura") with Massachusetts license plate 5GJG20 (registered to the defendant's girlfriend, *see* Dkt. No. 105-1) stopped nearby. Ex. A at 5-6. The defendant was in the front passenger seat; the driver was a white female. *Id.* at 3-4. The defendant instructed the CW to follow him. *Id*. at 3. The black Acura (with the CW in tow) then drove to the Mystic River Development public housing complex at 30 Memorial Drive. *Id.* at 4, 6. The defendant exited the Acura, retrieved a bag from inside one of the buildings in the complex, and entered the CW's car. *Id.* at 4. The CW gave the defendant $1,800 in exchange for a clear plastic bag containing suspected drugs.[2] *Id*. The defendant returned to the black Acura with the proceeds while the CW departed to meet with law enforcement. *Id.* at 4, 6.

About two weeks later, the defendant texted the CW on August 2, 2020 using phone number 857-247-5437. *See* Ex. A at 7. The defendant stated, "Yo yo-yo Tryna get rid of joint," a term law enforcement recognized from training, experience, and the conversation's overall context to refer to a gun. *Id.* at 7, 9. The CW and defendant proceeded to negotiate a gun sale. *See id.* at 7-12. During their communications, the defendant used the FaceTime mobile application to show the CW the gun. *Id.* at 7. The defendant agreed to sell the CW a "Ruger" for $1,500 the next day in "Ville" (i.e., Somerville), and also stated that he "gotta Glock for sale"

---

[2] Sometime after the defendant's arrest in this case, laboratory testing confirmed the substance to be a mixture containing fentanyl weighing approximately 67.14 grams. *See* Ex. C.

3

– terms that law enforcement recognized as references to known firearms. *Id.* at 9-10. The CW agreed to the Ruger sale and expressed interest in the Glock, as well. *Id.* at 10.

The next morning, August 3, 2020, the defendant messaged the CW to meet him at 31 Sydney Street – the same location where the defendant and CW had met for their July 16, 2020 drug deal. *See* Ex. A at 12. Meanwhile, a team of investigators (many of whom had overseen the CW and defendant's July 16, 2020 drug deal) prepared to monitor the gun deal transaction. *See generally* Ex. A at 13. They provided the CW with a car equipped with hidden audio- and video-recording equipment, which also transmitted live audio from the car to law enforcement.[3] *Id.* Law enforcement gave the CW $1,500 for the deal. *Id.*

Law enforcement set up surveillance in the area of 31 Sydney Street at 9:50 a.m., using an ATF-dedicated radio channel to communicate with one another during the operation. *See* Ex. A at 13; Ex. B at 1. Law enforcement stationed on Temple Street reported seeing a black Acura stop directly in front of them on Temple Street across from Sydney Street. *See* Ex. B at 1-2. Law enforcement saw the defendant, wearing a distinctive American flag t-shirt, exit the Acura's front passenger side and walk down Temple Street away from Sydney Street.[4] *Id.* at 2.

At about 10:06 a.m., the CW parked on Sydney Street and waited. *See* Ex. A at 13. Soon thereafter, law enforcement saw the defendant approach the CW's car on foot and enter the car's front passenger seat. *See* Ex. A at 7, 13; Ex. E, Audio/Video Recording of Firearm Transaction, at 21:29. The defendant directed the CW to drive around the corner onto Taylor Street while indicating that he would take payment first, and then return with the firearm and leave it in the

---

[3] The equipment operated properly for the duration of the operation and captured the transaction between the defendant and CW. A recording from the August 3, 2020 deal showing one of the camera angles that captured the transaction is attached hereto at Exhibit E.

[4] From their combined observations, investigators concluded the defendant walked around the block to reach the CW's car, which was parked only a few hundred yards from where the defendant initially had exited the Acura had he proceeded directly. *See* Ex. B at 2.

4

trunk of the CW's car. *See* Ex. A at 7; Ex. E at 23:25 – 23:34. The CW refused those terms; after some discussion, they agreed the defendant would return to the CW's car with the gun and leave it in the car. Ex. A; *see* Ex. E at 23:34 – 25:28; 25:51 – 26:03; 29:44-29:58.

Law enforcement next saw the defendant exit the CW's car and return to the Acura via Sydney Street. Ex. A at 8, 13. At the Acura, law enforcement saw the defendant retrieve a white bag from the Acura's trunk. Ex. B at 2. The defendant brought the white bag to the Acura's passenger side, placed it on the passenger seat, and leaned inside the car. *Id.* at 2. The defendant next returned the bag to the trunk and closed the trunk. *Id*. Holding what appeared to be a white t-shirt in his hand and draping a smaller-sized towel over his shoulder, the defendant walked on Sydney Street back towards the CW's car. *Id*. While the defendant was at the Acura, the CW called law enforcement and spoke with an agent. *See* Ex. E at 26:30 – 29:10. The CW relayed what had just transpired, including the defendant's confirmation that he had a gun for sale and that he had left the car to go get the gun. *Id*.

The defendant returned to the CW's car on foot, this time entering its back seat. *See* Ex. A at 7, 14; Ex. E at 31:44 – 31:56. The defendant showed the CW a silver and black pistol, including its loaded magazine, *see* Ex. E at 32:01- 32:17, and directed the CW to drive him to Temple Street to drop him off. *See* Ex. A at 7. The defendant acted as if he were stashing the gun under the driver's seat by seemingly wrapping it in the towel and white t-shirt he had brought with him. *See* Ex. A at 7. The CW handed the defendant $1,500. *See* Ex. E at 33:05; 33:53 – 34:05.

Meanwhile, law enforcement saw the CW's car drive on Temple Street and turn right onto Memorial Road. *See* Ex. A at 14. The CW stopped on Memorial Road, and the defendant exited the car from the rear passenger side. *Id*. He no longer had the white t-shirt or towel with

5

him. *See* Ex. B at 2. The defendant walked back to the black Acura while the CW turned the car around, took a left onto Temple Street, and began to drive away. *Id.*; *see* Ex. A at 8.

When the defendant reached the Acura, he first accessed its trunk. *See* Ex. A at 15. He then went to the front passenger side door and opened it. *See* Ex. B at 2; Ex. A at 15. Law enforcement next saw the defendant pat his pockets. *Id*. The defendant then began running on Temple Street in the same direction the CW was driving, towards Mystic Avenue. Ex. B at 2.

As the CW drove away, the CW checked the back seat for the firearm. *See* Ex. A at 8. The bundled white t-shirt and towel were under the seat, but the firearm was not. *Id*. The CW also noticed the defendant's cellphone on the back seat. *Id*. The CW contacted an agent and informed him that the defendant had taken the gun and cash but left his phone. *Id*. As they spoke, the CW saw the defendant chasing the CW's car. *See id*. at 8, 14. The agent instructed the CW to continue driving; the CW ultimately went to a debriefing location and met with law enforcement. *Id.* at 8, 14. Law enforcement recovered the defendant's phone, the towel, and the white t-shirt from the car. *See* Ex. A at 14.

Other officers intervened as the defendant chased the CW's car, ultimately stopping him at the intersection of Mystic Avenue and Taylor Street. Ex. A at 14. The defendant had $1,500 clutched in his hand. *Id.* The defendant's arrest and fraudulent gun deal were broadcast over the ATF radio channel. *Id.* at 15. Meanwhile, law enforcement approached the female driver of the Acura, who was then seated in the car's driver's seat while parked on Temple Street. *See id.* at 15-16; Ex. B at 3. The driver identified herself as the car's owner, confirmed the defendant had been a passenger in her car, acknowledged he had items in the car, and denied knowledge of any contraband being in the vehicle. Ex. B at 3. Before searching the car, law enforcement sought and obtained the black Acura owner's consent to search the car. The driver provided that

consent both verbally and in writing. Ex. A at 16; Ex. B at 3. At some point in time, the driver also was advised of her *Miranda* rights. *See* Ex. B at 3; Ex. A at 20.

During their search of the Acura, law enforcement discovered a quantity of suspected drugs in a clear plastic bag in the glove box, situated among identification documents and a wallet appearing to belong to the defendant.[5] *See* Ex. A at 16; Ex. B at 3. During the search of the car's trunk, law enforcement found the same white bag law enforcement previously had observed the defendant remove from the trunk, bring to the front passenger seat, and then return to the trunk mid-deal. *See* Ex. A at 16; Ex. B at 3. The white bag contained a loaded silver and black Ruger pistol along with a bag of suspected marijuana. *See* Ex. A at 16. When asked about the white bag in the trunk, the driver indicated that it belonged to "Tevon." *See* Ex. B at 3.

## II.   Legal Analysis

### A. The Automobile Exception Permits A Warrantless Search Of A Car Where There Is Probable Cause To Believe The Car Contains Contraband.

A lawful search under the Fourth Amendment must be supported by a valid warrant or fall within an exception to the warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). The automobile exception is a well-established exception to the warrant requirement. *Florida v. White*, 526 U.S. 559, 563-64 (1999); *California v. Acevedo*, 500 U.S. 565, 580 (1991). When the automobile exception applies, "a warrantless search of an automobile may proceed so long as the authorities have probable cause to believe that contraband is within the particular vehicle." *United States v. Simpkins*, 978 F.3d 1, 6-7 & n.1 (1st Cir. 2020); *United States v. Lopez*, 380 F.3d 538, 543-45 (1st Cir. 2004). Furthermore, the law is clear that when the automobile exception applies, police may search "***every part of the vehicle and its contents***,

---

[5] Laboratory testing subsequently confirmed the substance consisted of a mixture containing fentanyl that weighed approximately 16.46 grams. *See* Ex. D.

*including all containers and packages*, that may conceal the object of the search." *United States v. Santana*, 895 F.2d 850, 852 (1st Cir. 1990) (emphasis added); *see also Arizona v. Gant*, 556 U.S. 332, 347 (2009) (police may "search [] any area of the vehicle" for evidence of criminal activity if "there is probable cause to believe a vehicle contains [such evidence]").

Probable cause is not proof beyond a reasonable doubt. *Logue v. Dore*, 103 F.3d 1040, 1044 (1st Cir. 1997). It "exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Pontoo*, 666 F.3d 20, 31 (1st Cir. 2011); *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014). Probable cause requires only a "fair probability" that a crime has been committed, *Illinois v. Gates*, 462 U.S. 213, 238 (1983), and this standard does not mean "more likely true than false," *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999). When reviewing the presence of probable cause, courts look to the "collective knowledge" of all officers participating in the investigation rather than isolating the information known by the individual officer who makes the arrest. *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017); *see also Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all."); *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002).

### B. Law Enforcement Had Probable Cause To Believe That The Black Acura Defendant Accessed During The Gun Deal And To Which He Returned Post-Deal (And Which He Had Previously Used to Transport Contraband) Contained Contraband.

Law enforcement officers had a reasonable belief that the black Acura in which the defendant arrived to the gun deal, which he visited mid-deal to seemingly retrieve a gun from the trunk area, and to which he returned post-deal (including accessing the trunk and visiting the

8

car's front passenger side area) likely contained evidence of criminal wrongdoing. That belief was based on a multitude of factors that supported a warrantless search of the car.

*First*, law enforcement knew the day before the deal occurred that the defendant had texted the CW that he had more than one firearm for sale. *See* Ex. A at 9-12. Specifically, the defendant told the CW that he was "[t]ryna get rid of joint," confirmed the model of that gun as a "Ruger," and noted he "gotta Glock for sale," in which the CW similarly expressed interest. *Id.* at 9-10. In their text communication, the CW and defendant discussed pricing for each firearm, a meetup location, and agreed to meet the following day. *Id.* at 9-12. The morning of the deal, the CW and defendant texted again, re-confirming the time and location of the deal. Thus, even before the defendant and CW met, law enforcement knew the defendant (a convicted felon) had indicated he had more than one firearm that he was interested in selling and that he planned to sell at least one of them to the CW during their scheduled meetup on August 3, 2020. *See United States v. Simpkins*, 978 F.3d 1, 7-8 (1st Cir. 2020) (officers lawfully searched car under automobile exception where informant told officers that defendant was drug supplier, provided description of defendant's car, showed officers series of text messages with defendant in which drugs were discussed, and informant coordinated a deal with defendant on same day that officers stopped defendant's car); *United States v. Rushin-Felder*, No. 2:17-CR-00138, 2019 WL 1529492, at *7 (W.D. Pa. Apr. 9, 2019) (citing pre-deal communications between law enforcement and suspected drug dealer arranging for drug buy at specific location as relevant factor supporting officer's probable cause to search defendant's car when he subsequently arrived at agreed-upon scene of deal).

*Second*, law enforcement knew that the black Acura in which the defendant arrived for the gun deal on August 3, 2020, had previously been used by the defendant to facilitate a drug

deal just two weeks earlier. *See* Ex. A at. On July 16, 2020, based on communications between the CW and the defendant coordinating a drug deal, officers had observed the defendant arrive at an agreed-upon location (31 Sydney Street – the same spot as the August 3, 2020 gun deal) in that same car and with a similar looking driver (white female). *See* Ex. A at 3-6. The defendant had the CW follow the black Acura to housing in the Mystic Ave area where he briefly entered a location, exited with a bag, entered the CW's car to ultimately do a sixty-plus gram fentanyl deal, and returned to the black Acura with the proceeds of the illicit deal. *See id.* Thus, law enforcement knew the defendant had used the same car as a means of facilitating criminal activity and transporting drug proceeds in the same location and with that same CW on a recent prior occasion. *See United States v. White*, 804 F.3d 132, 136-38 (1st Cir. 2015) (warrantless search of defendant's car lawful under automobile exception where informant told officers that defendant was drug distributor who sold drugs from his vehicle and that informant previously had purchased drugs from defendant, where officers corroborated informant's information via two controlled buys with defendant, and where moments before traffic stop, informant called defendant to arrange a deal, and minutes later, officers saw defendant leave home in same vehicle used during prior drug deals); *Rushin-Felder*, 2019 WL 1529492, at *7 (pre-deal conversations between law enforcement and suspected drug dealer arranging for a drug buy at a specific location, coupled with the simultaneous arrival of a vehicle and the suspected drug dealer at the agreed-upon meet location, provided sufficient probable cause for officers to believe vehicle had contraband permitting warrantless search).

*Third*, at the time and the place of the planned gun deal, officers with different vantage points of the defendant and the CW saw conduct consistent with the details the defendant and CW had discussed in text messages both that morning and the prior day. *See, e.g., United States*

*v. Cobb*, 483 F. App'x 719, 723–24 (3d Cir. 2012) (upholding warrantless search of car trunk where officers had probable cause, based on electronic and physical surveillance, to believe drugs in car). Collectively, that surveillance revealed that the defendant arrived in the location he had messaged to the CW for the deal – 31 Sydney Street in Somerville – in a black Acura at the same hour he had discussed on his text communications with the CW for a gun sale. *See* Ex. A at 12 (confirming gun deal meetup location as "31 Sydney st som"); *see also United States v. Gonsalves*, 859 F.3d 95, 104-05 (1st Cir. 2017) (informant's tip that defendant was transporting drugs provided probable cause to stop and search defendant's car where informant had previously provided reliable information to police, informant admitted to buying drugs from defendant before, tip included details of defendant's future activity, and almost all details were corroborated by police surveillance before defendant's car was stopped); *see also United States v. Sellers*, 897 F. Supp. 2d 754, 769 (N.D. Ind. 2012) (officers had probable cause to search trunk of defendant's car where at time of search, officers knew defendant had sold informant drugs before, that defendant was present in agreed-upon location to sell drugs to the informant, that informant identified the defendant's car as being one of only two cars in the meeting spot's parking lot, and that defendant identified himself by same first name as investigation's target).

*Fourth*, before entering the CW's car on Sydney Street, which was located a short distance from the black Acura, law enforcement saw the defendant take a curious detour. Despite parking opposite Sydney Street, the defendant walked in the opposite direction of the CW's car, circling an entire city block before returning to the area of the CW's car, which he ultimately entered. Based on their observations, training, and experience, law enforcement recognized the defendant's seemingly pointless, circuitous walk, before entering a car by his original location, as conduct consistent with countersurveillance. *United States v. Martinez-*

11

*Molina*, 64 F.3d 719, 729 n.8 (1st Cir. 1995) (countersurveillance efforts indicative of knowing participation in criminal activity); *United States v. Iafelice*, 978 F.2d 92, 95 (3d Cir. 1992).

*Fifth*, based on live updates law enforcement received during the gun deal (via the car recording and CW) and corroborating surveillance, officers were aware that the defendant retrieved a gun from the black Acura, which he then brought into the CW's car. That is, law enforcement knew the defendant had stored at least one gun in the black Acura while the deal with the CW was underway. Specifically, law enforcement saw the defendant exit the CW's car mid-deal, return to the black Acura, and open its trunk. Simultaneous with this observed conduct, the CW called agents to relay that the defendant confirmed he had a gun, that he wanted to sell it without showing it to the CW, and that upon the CW's refusal to that one-sided deal, the defendant had needed to exit the car to get the gun from elsewhere (which surveillance determined to be the black Acura). Law enforcement next saw the defendant remove a white bag from the trunk. Before returning to the CW's car, surveillance saw him with a white t-shirt in his hand and a towel over his shoulder. They also saw him move the white bag to the vehicle's passenger side before returning it to the trunk, shutting it, and walking back to the CW's car with what appeared to be a towel and t-shirt.[6] In reality, and as law enforcement learned from the car's recording and the CW's immediate post-deal relaying of information, the defendant had used the towel/t-shirt combination to conceal a gun as he moved it from the black Acura to the CW's car. *United States v. Mainor*, 393 F. App'x 10, 17 (3d Cir. 2010) (electronic and physical surveillance supported probable cause that car contained suspected narcotics where officers received information that driver had arranged drug sale to occur on day stop occurred and officers witnessed driver place large plastic bag in trunk after meeting with buyer). Indeed, mere

---

[6] The defendant also acknowledges these facts. *See* Dkt. No. 105 at 6-7 (describing movement of white bag from Acura trunk to passenger seat to sift through contents and then returning it to trunk).

moments after the deal ended, the CW called law enforcement to relay that the defendant had brought a gun into the car, accepted $1,500 cash for it, but had not in fact left any gun in the car.

*Sixth*, soon after the botched deal ended, law enforcement saw the defendant back at the black Acura accessing its trunk area before going to the front passenger side area. Minutes later, after law enforcement detained the defendant following his chase of the CW's car, they learned the defendant had no gun on his person, either (although he did have $1,500 cash from the fraudulent gun deal clutched in his hands). *See United States v. Gaskin*, 364 F.3d 438, 457-58 (2d Cir. 2004) (where cooperating witness indicated defendant carried gun during drug deals, public information corroborated defendant's ownership of guns, and where agents found no gun on defendant's person during arrest, agents could reasonably conclude defendant had brought one or more guns to a coordinated delivery site and that firearms probably were in his car).

At that point, law enforcement knew that the defendant had texted the CW pre-deal that he had more than one gun for sale that day, that the black Acura had at least initially contained a firearm which – based on reliable information from the CW – they knew the defendant had retrieved from that car mid-deal, and that the defendant had returned to the black Acura moments before his foot chase. Law enforcement also knew the defendant had previously arrived in that same location and in that same car for purposes of doing a drug deal with that same CW. Lastly, officers knew that there was no gun in the CW's vehicle or on the defendant's person at time of arrest, despite the brief passage of time from him exiting the CW's car and ultimately being arrested. These facts, taken together, provided ample probable cause for law enforcement to believe the black Acura contained incriminating evidence, which they could lawfully search without a warrant. *See United States v. Gamory*, No. CRIM 108-CR-153-TWT, 2009 WL 855948, at *16-17 (N.D. Ga. Mar. 30, 2009) (search of car lawful under automobile exception

where informant coordinated drug buy with defendant, surveillance observed defendant drive car to predetermined location, and before deal occurred, defendant drove off driving erratically before parking car elsewhere). Courts have found probable cause to search a vehicle for a gun on far less facts than those in this case. *See, e.g., United States v. Spencer*, 1 F.3d 742, 746 (9th Cir. 1992) (police had probable cause to believe vehicle contained gun where defendant was wearing holster and made suspicious movements while in car). Because law enforcement had probable cause to believe the black Acura contained contraband, officers needed no consent – whether from the defendant or car owner – to search the black Acura for evidence of a crime.

**C. Officers' Reasonable Belief That The Car Contained Contraband Extended To The White Bag In The Trunk, Which Law Enforcement Saw Defendant Access Mid-Deal Before Entering CW's Car With The Gun.**

Because there was probable cause to believe that the black car contained evidence of criminal activity, law enforcement could "search without a warrant any area of the vehicle in which the evidence [might] be found." *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011); *see also Acevedo*, 500 U.S. at 580 (automobile exception allows police to "search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained"). Here, where officers were searching for evidence of criminal wrongdoing including firearm possession, they could search in any areas or containers that might reasonably contain a gun. The Acura's trunk and the white bag contained therein lawfully fell within the scope of that search. Law enforcement saw the defendant access the Acura's trunk and remove a white bag from it mid-deal. Following that conduct, law enforcement saw the defendant return the white bag to the trunk, close the trunk, and ultimately enter the CW's car with a gun. Law enforcement also saw the defendant return to the black Acura's trunk area post-deal while simultaneously learning that he had not left any gun in the CW's car. *United States v.*

14

*Ross*, 456 U.S. 798, 820-24 (1982) (lawful search of car under automobile exception may extend to car compartment (trunk, glove compartment, console, or engine area), whether locked or unlocked, and to containers, open or closed, that might conceal contraband or evidence of suspected crime); *United States v. Maguire*, 918 F.2d 254, 260 (1st Cir. 1990) (warrantless search lawful under automobile exception where even though bags were in trunk and not in car's passenger compartment, there was reasonable cause to believe the bags contained evidence of a bank robbery, thus constituting contraband); *see also United States v. Mangum*, 871 F. Supp. 1486, 1490-91 (D.D.C. 1995), *aff'd*, 100 F.3d 164 (D.C. Cir. 1996) (concluding police had probable cause to believe backpack in car trunk contained a handgun based on totality of circumstances, including reliable informant coupled with police corroboration of virtually every detail of the informant's story). The defendant's status as a passenger in the Acura does not alter this legal framework. To the contrary, the law recognizes that where law enforcement has probable cause to search a car for contraband, they may "inspect passengers' belongings found in the car that [we]re capable of concealing the object of the search" – even if such belongings were identified as the passengers before officers searched the belongings.[7] *Wyoming v. Houghton*,

---

[7] The First Circuit's decision in *Infante-Ruiz* similarly does not help the defendant. *See* Dkt. No. 105 at 7 (discussing *United States v. Infante-Ruiz*, 13 F.3d 498, 501 (1st Cir. 1994)). In *Infante-Ruiz*, the defendant was a passenger in a rental car with an outstanding warrant for a federal narcotics charge. *Id.* at 500. Police stopped the car in which he was traveling and searched it, including the trunk, where they found a locked briefcase belonging to the defendant, which – when unlocked – had a gun. *Id*. In marked contrast to the facts at issue here, the officers in *Infante-Ruiz* lacked concrete information that the defendant might be transporting drugs or weapons at the time of the stop. *Id.* at 502. Here, police not only had confirmation that the defendant possessed a gun after accessing the black Acura's trunk area and returning to the CW's car, but they also knew he had gone back to the black Acura (including its trunk) before hotly pursuing the CW's car, and they knew that no gun was on the defendant's person (or in the CW's car) when he was detained. Police also had observed the defendant access a white bag in the car's trunk mid-deal. If anything, *Infante-Ruiz* serves to highlight the lawfulness of law enforcement's conduct in this case. *See id.* at 502 ("[I]f the police have probable cause to believe that either a vehicle or a container within a vehicle contains contraband, evidence of crime, or other matter that may lawfully be seized, no Fourth Amendment violation occurs when the police open and search the container without a warrant," provided there are

526 U.S. 295, 302-04 (1999) ("Effective law enforcement would be appreciably impaired without the ability to search a passenger's personal belongings when there is reason to believe contraband or evidence of criminal wrongdoing is hidden in the car."); *United States v. Williams*, 23 F. Supp. 3d 46, 47, 50 (D. Mass. 2014).

### D. Officers' Acquisition Of The Car Owner's Consent[8] Pre-Search Demonstrates Law Enforcement's Careful and Conservative Approach In a Fluid and Potentially Dangerous Situation.

The defendant sidesteps the automobile exception altogether and centers his argument upon the car owner's consent before any search of the car occurred. That argument is a non-starter. As previously set forth, based on the automobile exception, law enforcement legally could have begun searching the black Acura without requesting any such consent. That they did so speaks to the measured approach they took to securing a quickly evolving scenario in which a loaded gun was potentially unsecured in a public area. *See generally United States v. Webb*, 83 F.3d 913, 917 (7th Cir. 1996) (officers may perform warrantless search of vehicle under exigent circumstances exception where search is necessary to locate and secure a gun to protect the public); *United States v. Feldman*, 788 F.2d 544, 553 (9th Cir. 1986) (inventory search of car on scene held lawful where officer reasonably believed car might contain gun).

---

"particular facts indicating that, at the time of search, the vehicle or a container within it carried contraband, evidence of crime, or other seizable matter").

[8] The defendant does not challenge the legality of the car owner's consent, but rather, its applicable scope. Generally, the law recognizes consent to be a "specifically established exception[ ]" to the Fourth Amendment's "requirements of both a warrant and probable cause." *United States v. Vilches–Navarrete*, 523 F.3d 1, 15 (1st Cir. 2008) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). For consent to be valid, it must be given knowingly, intelligently, and voluntarily. *See United States v. Franklin*, 630 F.3d 53, 59–60 (1st Cir. 2011) (citing *United States v. Marshall*, 384 F.3d 281, 286 (1st Cir. 2003)). Here, the car owner consented both verbally and in writing to a search of the car, further supporting the lawfulness of officers' search of the car for contraband.

The officers' cautious approach prior to searching the black Acura also speaks to an important reality about the risks officers faced: The defendant had taken off sprinting down the street, and the car's owner *was in the driver's seat behind the steering wheel*. The law recognizes a certain exigency underscoring the automobile exception's application. *See, e.g.*, *United States v. Howard*, 489 F.3d 484, 494 (2d Cir. 2007) ("[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction"); *see also United States v. Vassilou*, 820 F.2d 28, 30 (2d Cir. 1987). Here, the car could have become mobile at any moment, particularly depending on what transpired during the defendant's chase of the CW's car. *Polanco*, 634 F.3d at 43 (referencing "an impressive convoy of auto-exception cases [that] hold[] that if the requisite probable cause exists" to believe a car might contain contraband, "it matters not whether the vehicle was already parked, whether it was searched at another locale, or even whether agents had time to obtain a warrant first" (citing *United States v. McCoy*, 977 F.2d 706, 710 (1st Cir. 1992); *United States v. Panitz*, 907 F.2d 1267, 1270 n.3, 1271 (1st Cir. 1990); *Ross*, 456 U.S. at 807 n.9; *Lopez*, 380 F.3d at 545)). That law enforcement sought consent (both verbally and in writing) from the car's driver before any search commenced served to diffuse the risk of potential harm to themselves or the public, where officers knew the car might contain at least one loaded gun. That is police conduct to be encouraged, not deterred. *See United States v. Thomas*, 736 F.3d 54, 60 (1st Cir. 2013) ("Exclusion is not an automatic consequence of a Fourth Amendment violation, but rather is available only where the benefits of deterring the police misconduct that produced the violation outweigh the costs of excluding relevant evidence.").

### E. Defendant-Passenger Has No Standing To Challenge The Search Of The Car Given The Car Owner's Lawfully Obtained Consent.

In his Motion, the defendant specifically challenges the black Acura owner's ability to consent to a search of his bag in the trunk; notably, he does not challenge the owner's ability to consent to a search of the Acura overall.  Nor could he.  The defendant concedes in his affidavit that the Acura was not his.  *See* Dkt. No. 105-1 ("I was arrested in Somerville, Massachusetts in the presence of my girlfriend ***and her vehicle***.").  Therefore, the defendant has not demonstrated the propriety interest or expectation of privacy in the black Acura required to have standing to contest law enforcement's search of the car.[9]  *See United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (defendant has burden under standing doctrine to show "he has a reasonable expectation of privacy in the area searched and in relation to the items seized").

Courts routinely hold that car passengers do not have a reasonable expectation of privacy in areas within another person's car, including glove compartments, spaces beneath passenger seats, or trunks.  *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978) (defendants-passengers had no reasonable expectation of privacy in car they neither owned nor leased; car areas like glove compartment, area under passenger seat, or car trunk "are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy"); *United States v. Symonevich*, 688 F.3d 12, 21 (1st Cir. 2012) (defendant-passenger did not have reasonable expectation of privacy in girlfriend's car, including space beneath passenger seat where defendant stashed a can containing heroin); *United States v. Almeida*, 748 F.3d 41, 47-48 (1st Cir. 2014); *United States v. Cardona*, 955 F.2d 976, 981 (5th Cir. 1992) (defendant-passenger

---

[9] The First Circuit in *United States v. Maguire* determined that it did not have to resolve the question of a defendant's standing to challenge a car search that resulted in a seizure of contraband because it already had found probable cause for the search under the automobile exception.  *See generally Maguire*, 918 F.2d 254, 261 (1st Cir. 1990).

lacked standing to challenge search of vehicle's trunk where drugs found); *United States v. Aguirre*, 839 F.2d 854, 856-57 (1st Cir. 1988).

    **F. The Recovery Of Fentanyl From Glove Compartment After Car Owner Consented To Search Made Discovery Of Gun in Trunk Inevitable.**

Based on the black Acura owner's consent to search her car, law enforcement properly searched the car's interior, including the passenger side area and glove compartment, where officers found what they suspected, in their training and experience, was a bag of drugs. At that point, officers plainly had probable cause to believe the Acura contained contraband, independent of the probable cause to believe the car contained evidence relating to illegal gun possession. Thus, the recovery of fentanyl from the glove compartment permitted law enforcement to search the entire vehicle for additional evidence of drug dealing, including the trunk and closed containers therein, like the white bag. *See, e.g.*, *United States v. Tanguay*, No. 16-CR-96-01-JD, 2017 WL 1512356, at *12-13 (D.N.H. Apr. 27, 2017); *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996) (officers' discovery of drugs provided probable cause to search passenger compartment for more contraband); *see also United States v. Ortiz*, 577 F. App'x. 627, 628 (8th Cir. 2014) (same). Accordingly, law enforcement's discovery of the loaded gun in the car's trunk was inevitable. *See generally Nix v. Williams*, 467 U.S. 431, 444 (1984) (inevitable discovery doctrine allows admission of evidence that would have been discovered even without unconstitutional source); *United States v. Soto-Peguero*, 978 F.3d 13, 20-23 (1st Cir. 2020) (same); *United States v. Munoz*, 590 F.3d 916, 923-24 (8th Cir. 2010) (affirming seizure of contraband from defendant-driver's backpack where renter-passenger of car consented to vehicle search; while renter's consent to search vehicle did not extend to search of what was identified as defendant's backpack, officer's discovery of drug paraphernalia in center console rendered

discovery of gun in backpack inevitable as it provided "probable cause to search anywhere in the car, including in the backpack, for further evidence of drug activity").

## CONCLUSION

For all the foregoing reasons, the government respectfully requests that this Court deny the defendant's Motion to Suppress. The government further submits that no evidentiary hearing is warranted.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  /s/ Kaitlin R. O'Donnell
Kaitlin R. O'Donnell
Fred W. Wyshak, III
Assistant United States Attorneys

Date:  February 14, 2022

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Kaitlin R. O'Donnell
Kaitlin R. O'Donnell
Assistant U.S. Attorney

Date: February 14, 2022